FILED

2013 Mar-28  AM 11:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SONJIA JACKSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. |
| | ) | 5:11-CV-3092-KOB |
| MICHAEL ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January, 29, 2008, the claimant, Sonjia Jackson, applied for disability insurance

benefits under Title II of the Social Security Act. (R. 12). The claimant alleged disability

commencing on July 30, 2007, because of diabetes mellitus, hypertension, right hip bursitis, and

depression. (R. 14). The claimant later amended her alleged onset date to April 9, 2008. The

claimant's last date insured was December 31, 2008. The Commissioner denied the claim on

May 9, 2008. The claimant filed a timely request for a hearing before an Administrative Law

Judge and the ALJ held a hearing on November 10, 2009. In a decision dated December 4, 2009,

the ALJ found the claimant was not disabled as defined by the Social Security Act and thus was

ineligible for disability insurance benefits. (R. 12). On June 24, 2011, the Appeals Council

denied the claimant's request for review; consequently, the ALJ's decision became the final

decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has

exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the

Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ erred in

setting the claimant's residual functional capacity for a full range of medium exertional level

work that did not take into account all of the medically-established functional limitations; and (2)

whether the ALJ erred in finding that the claimant's alleged mental impairments were not severe

or disabling.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham*

*v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The

court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look

only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of evidence that detracts from the evidence relied on by the

ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability. A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Residual functional capacity (RFC) is an assessment, based upon all of the relevant

evidence, of a claimant's remaining ability to do work, despite her impairments. *Lewis v.

Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. § 404.1545(a). The ALJ

makes this determination by considering the claimant's ability to lift weight, sit, stand, push, pull,

etc. 20 C.F.R. § 404.1545(b). To determine the physical exertion requirements of work in the national economy, jobs are classified as *sedentary*, *light*, *medium*, *heavy*, and *very heavy*. 20 C.F.R. § 404.1567. The exertional classifications have the same meaning as they have in the Dictionary of Occupational Titles. *See id.* "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c); *see also Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

An impairment "is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see also Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). "Basic work activities" include: "(1) Physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers, and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986); *see also Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984). The claimant bears the burden . . . of proving that she has a severe impairment or combination of impairments. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). Even if an ALJ errs in concluding that some of a claimant's impairments are not severe, such error is harmless if the ALJ deems other medical impairments to be severe and proceeds with the sequential inquiry.

*Delia v. Commissioner of Social Security*, 433 Fed.Appx. 885, 887 (11th Cir. 2011); *see also*

*Burgin v. Commissioner of Social Security*, 420 Fed.Appx. 901, 903 (11th Cir. 2011) ("Even

assuming the ALJ erred when he concluded [the claimant's] edema, sleep apnea, and obesity

were not severe impairments, that error was harmless because the ALJ considered all of his

impairments in combination at later steps in the evaluation process.").

## V. FACTS

The claimant has a high school education and was fifty years old at the time of the

administrative hearing. (R. 34, 99). Her past work experience includes employment as a food

service worker, manager and cashier at a convenience store, and manager of a Dollar General

Store. (R. 41-42). The claimant originally alleged she was unable to work because of diabetes,

hypertension, bursitis in her right hip, and depression. (R. 14). The claimant testified that injuries

from a fall at work on October 18, 2006 cause her hip pain. (R. 32, 181).

*Physical Limitations*

On October 18, 2006, the claimant sustained a hip injury when she fell down a flight of

stairs. (R. 183). At the time of the accident, the claimant sustained no fractures, but did develop a

bruise on her right hip. (R. 214). The bruise developed into a hematoma, which hardened into a

subcutaneous mass. (R. 221). From December, 2006, through April, 2007, the claimant received

treatment from Dr. Jack Moore at Sportsmed Orthopaedic Surgery & Spine Center. (R. 218-220).

Non-surgical attempts to relieve the claimant's pain associated with her hematoma were

unsuccessful, and on April 24, 2007, the claimant underwent surgery to excise the subcutaneous

mass from her hip. (R. 214).

From May 2, 2007 until July 11, 2007, Dr. Moore conducted follow-up evaluations of the

claimant's hip to assess post-surgical recovery. On May 2, 2007, Dr. Moore noted that the

claimant could not bend, stoop, kneel, or strain, and should not stand for prolonged periods.

However, the claimant could do a sitting job. On May 17, 2007, Dr. Moore reiterated these

restrictions, and also provided that the claimant should be excused from work if the restrictions

could not be met. On the claimant's next visit on May 23, 2007, Dr. Moore repeated these

restrictions. Dr. Moore noted on June 13, 2007, that the claimant could return to half shifts of six

hours per day so long as the claimant's modified duties could be met. On June 21, 2007, Dr.

Moore noted that the claimant's wound was well-healed and that the claimant could return to full

work shifts beginning July 1, 2007. Dr. Moore recorded on July 11, 2007, that the claimant

continued to complain of pain, but that it was decreasing. He also stated that the claimant could

return to regular duty at work. (R. 207-212).  The record shows that the claimant earned only

$4229.59 during 2007 and nothing since 2007, which indicates that she did not return to work at

this time.  (R. 82-83).

The claimant's OBGYN, Dr. William Beasley, noted on February 27, 2006, that the

claimant complained of right-side lumbago and pain stemming from long periods of time spent

sitting at a casino. At this time, Dr. Beasley indicated the claimant's mood and affect were

appropriate. On June 1, 2006, Dr. Beasley treated the claimant for complaints of lumbago,

diabetes, and hypertension, and again noted that the claimant's mood and affect were appropriate.

On July 5, 2006, the claimant received treatment for postmenopausal symptoms; lab reports

conducted shortly after this visit indicated that the claimant's glucose level was high. The

claimant's post-menopausal complaints continued into September, 2006, and Dr. Beasley again

noted the claimant's diabetes and hypertension, as well as her anxiety and depression, which

were being treated with Lexapro. The claimant returned to Dr. Beasley's office in October, 2006,

shortly after her fall on the stairwell. Dr. Beasley determined the claimant should stop work for

two weeks, but noted the claimant had no fracture in her pelvis. He also noted that the claimant

desired to switch her medication for depression from Lexapro to Effexor, and that she understood

the risk associated with this switch. On November 6, 2006, Dr. Beasley noted that the switch to

Effexor had improved the claimant's anxiety and depression. (R. 231-235).

On December 4, 2006, Dr. Beasley noted that the claimant had not been following diet or

glucose as it related to her diabetes. He emphasized diet and weight loss to the claimant. On

February 22, 2007, the claimant informed Dr. Beasley that her diabetes was under good control.

Dr. Beasley noted on July 24, 2007, that the claimant continued to have persistent pain in her

right hip associated with her fall down the stairwell in October, 2006. He also indicated that the

claimant's diabetes was being treated successfully with Actos, and that the claimant understood

diet and weight loss instructions. The claimant's hypertension was also under control at this time,

although her depression was classified as moderate. On January 24, 2008, the claimant's glucose

reading was elevated, and the claimant indicated she understood the extreme importance of

glucose control. (R. 226-230).

On April 21, 2008, Dr. Samuel Chastain, a medical consultant, conducted a Physical

Residual Functional Capacity Assessment at the request of the Disability Determination Service.

Dr. Chastain found that the claimant could occasionally lift fifty pounds, could frequently lift

twenty-five pounds, and could stand for a total of six hours in an eight-hour workday. In

addition, Dr. Chastain found that the claimant was limited in pushing or pulling in her lower

extremities due to her hip contusion. Dr. Chastain further indicated that the claimant had only

occasional limitations as to stooping, kneeling, crouching, or crawling, but should never climb

ladders, scaffolds, or ropes. (R. 254-261).

On July 28, 2008, Dr. Stephen Mallette, a dermatologist, began treating the claimant for

complaints of itching on her scalp. At the time of this visit, the claimant's glucose was slightly

elevated, and Dr. Mallette considered the claimant's blood work to be normal. On November 6,

2008, Dr. Mallette noted that the claimant's sugar levels ranged anywhere from 175 to 275, and

that the claimant asserts her high blood sugar levels seem to make her scalp itch more. Dr.

Mallette increased the dosage for the claimant's diabetic medication, and scheduled a follow-up

visit for the claimant. The claimant did not show up for that scheduled visit. (R. 296-299).

On February 16, 2009, the claimant began treatment with Dr. Michael Hennigan, an

endocrinologist. Dr. Hennigan noted that the claimant's diabetes had never been well controlled,

and that the numbness and tingling of her scalp had been confirmed as neuropathy. Dr. Hennigan

recorded that the claimant had a longstanding problem with anxious depression, but she was

taking medication and had some recent improvement. (R. 336-337). On March 19, 2009, Dr.

Hennigan noted that the claimant's diabetes was uncontrolled, but improved, and the claimant's

hypertension was also improved. (R. 320).

On May 11, 2009, the claimant sought a second opinion regarding her hip pain from Dr.

Randall Riehl at Decatur Orthopaedic Clinic. Dr. Riehl noted that while the claimant's hip injury

improved after it was surgically drained in 2007, she continued to have chronic pain associated

with her hip. X-rays revealed nothing abnormal, and Dr. Riehl indicated that the claimant should

not seek further treatment and should return to regular duty work. (R. 309).

*Mental Limitations*

On April 9, 2008, Dr. Piotr Zieba at Alabama Psychiatric Services conducted an

outpatient psychiatric evaluation of the claimant. Dr. Zieba noted that the claimant had been on

antidepressants since 1990, and was currently taking Effexor. Dr. Zieba increased her Effexor

dosage, and further prescribed Remeron as augmentation for her treatment of depression. Dr.

Zieba stated that the claimant's insight and judgment were somewhat impaired, and he gave the

claimant a Global Assessment of Functioning (GAF) score of 50, indicating serious

psychological symptoms. He noted he was hopeful that the claimant would improve with

treatment. (R. 344-345).

On May 2, 2008, Dr. Barry Wood, a clinical psychologist, conducted a mental

examination of the claimant. Dr. Wood reported that the claimant stated she began receiving

psychiatric treatment in 1992, and at that time was prescribed Prozac. The claimant went on to

state that her current medication, Effexor, was not as efficacious as it had been in the past. Dr.

Wood noted that the claimant had experienced suicidal ideation in October or November of 2007

stemming from a number of serious gynecological complications. The claimant further informed

Dr. Wood that she could not surgically treat her gynecological issues due to medical/logistical

problems. The claimant went on to complain of problems attaining and maintaining sleep, as well

as only being able to stand continuously for 30-45 minutes on a good day and 10-15 minutes on a

bad day. Dr. Wood noted that she could perform household chores in limited increments, and that

the claimant spent most of her time alone or with family. Dr. Wood's assessment indicated that

the claimant's mood appears to be improved, and while she can be somewhat distractible due to

her anxiety, she would likely be able to attend to tasks for at least two continuous hours. He

concluded his assessment by stating that the claimant's anxiety symptoms would affect, but not

preclude, her ability to interact with coworkers, supervisors, and customers. Dr. Wood gave the claimant a GAF score of 67, indicating only mild psychological symptoms. (R. 263-266).

At a follow-up visit on May 14, 2008, Dr. Zieba indicated that the claimant felt "horrible" and she was not taking her Remeron medication. On August 7, 2008, another doctor at Alabama Psychiatric Services, Dr. Fields, indicated the claimant felt "about the same." On January 21, 2009, the claimant's new psychiatrist, Dr. Penland, indicated the claimant felt "all right," but had run out of Effexor the day before and felt depressed. Dr. Penland prescribed Zoloft on a trial basis. On May 27, 2009, Dr. Penland noted that the claimant felt less depressed, was sleeping better, and was responding to treatment, which included Cymbalta. Dr. Penland further noted that the claimant appeared to be functioning well in everyday life, and no further medications were prescribed at that time. (R. 346-349).

## *The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits, the claimant requested and received a hearing before an ALJ. (R. 12). At the hearing, the claimant testified that she lived with her husband, her son, and her two grandchildren, as well as with her son's ex-wife. She went on to testify that after she wakes up, she reads or watches television and sometimes goes back to bed. Although she stated she had no trouble bathing, she testified that she does not bathe every day. She further testified that she takes seven pills every morning, including Cymbalta, Nexium, and three different kinds of blood pressure pills. (R. 28-30).

The claimant testified that she had diabetes since 2003, and that one symptom of her diabetes was the continual burning and itching of her scalp. She stated that because of these

symptoms, she has had sores on her head since May of 2008, and that the burning occurs when her blood sugars are high. She went on to state that she had begun to take injections of Byetta to control her diabetes. (R. 36-39).

The claimant's representative questioned her regarding her hip pain, and the claimant testified that it "hurts all the time." She stated that her feet tingle because of her diabetes, and she gets nauseated two days a week. She testified that more than half the days of a month she does not feel well enough to leave her house. (R. 40-41).

A vocational expert, Mr. Green, testified concerning the type and availability of jobs that the claimant was able to perform. He stated that the claimant's past relevant work as a food service worker, cashier and manager, and Dollar General Store manager, would all be classified as medium exertional, semi-skilled work. The ALJ asked Mr. Green if someone with a vocational profile similar to the claimant's would be able to perform her past relevant work. Mr. Green stated that the medical files indicated no limitations on the claimant's ability to perform this type of work, and the claimant's representative agreed with this statement. Mr. Green concluded by stating that if the claimant was not able to leave the house most days, then she would not be able to return to her past relevant work. (R. 41-44).

*The ALJ's Decision*

On December 4, 2009, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 12). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of her disability. Next, the ALJ found that the claimant's diabetes mellitus and hypertension qualified as severe impairments; he concluded, however, that these impairments did not singly nor in combination manifest the specific signs

and diagnostic findings required by the Listing of Impairments. The ALJ also found that the

claimant had bursitis in her hip and depression, but these impairments had not shown significant

limitations and were not severe. (R. 14-15).

The ALJ next considered the claimant's symptoms and allegations to determine whether

she had the residual functional capacity to perform her past relevant work. The ALJ found that

the claimant's medically determinable impairments could reasonably be expected to cause her

alleged symptoms, but the claimant's statements concerning the intensity, persistence and

limiting effects of those symptoms were not credible. (R. 15-16).

To support his conclusion, the ALJ first noted that the claimant reported an ability to

perform a wide range of daily activities. Her Daily Activities Questionnaire from March, 2008,

indicated she could take care of her own personal needs, shop, and prepare and cook meals. She

visited with friends and family twice a week, and talked with friends and relatives daily if she did

not feel depressed. Her Physical Activities Questionnaire indicated that she could perform some

normal household chores, such as laundry, cooking, and light housework. (R. 16).

The ALJ further noted that the medical evidence does not support the claimant's

continuing allegations of pain related to her hip injury. The ALJ found that the claimant's

physicians released her to return to work with no restrictions in July, 2007. Moreover, and MRI

in October, 2008 showed a significant decrease in the size of her hematoma, and in May of 2009,

her physician, Dr. Riehl, did not recommend treatment. The ALJ noted that Dr. Riehl advised the

claimant that she could return to regular duty work. (R. 17).

The ALJ also found no medical evidence to indicate the claimant's diabetes or

hypertension created any significant limitations on the claimant's ability to work. In March,

2009, the claimant's hypertension and diabetes both improved, and lab work in June 2009 indicated that her blood sugar level was controlled. (R. 17).

Although the medical records did indicate that the claimant suffered from depression, the ALJ found that the claimant's testimony concerning her level of activity did not support a finding of significant limitations related to her psychological impairments. The ALJ noted that Dr. Zieba scored the claimant's GAF at 50, but the evidence indicated that with appropriate medication, the claimant's depression had improved. Additionally, the ALJ found that although the claimant reported a long history of treatment for depression, she could still maintain her household, visit with family and friends every week, and take care of her son and grandchildren. These activities indicated to the ALJ that the claimant's depression did not significantly limit her ability to work. (R. 16).

The ALJ gave Dr. Wood's opinion considerable weight. The ALJ noted that Dr. Wood reported a GAF score of 67 for the claimant, and that her persisting anxiety symptoms would not preclude her ability to interact with co-workers, supervisors, or customers. Also, Dr. Wood noted the claimant could perform daily household activities, which would be inconsistent with disabling limitations. Finally, the ALJ found that on two separate occasions, the claimant was cleared to return to work; first, in July, 2007 by Sportsmed; and second, in May, 2009 by Dr. Riehl. Based on these findings and testimony from the vocational expert, the ALJ concluded that the claimant was capable of performing her past relevant work and, therefore, is not disabled under the Social Security Act. (R. 17-18).

## VI. DISCUSSION

**A. The claimant's residual functional capacity assessment**

The claimant argues on appeal that the ALJ's decision that the claimant could perform a full range of medium level work was not based on substantial evidence. To the contrary, this court finds that the ALJ properly assessed the claimant's residual functional capacity and substantial evidence supports his decision.

An ALJ assesses a claimant's RFC by examining the claimant's exertional and non-exertional capacities. 20 C.F.R. § 404.1569; *see also* Social Security Ruling 96-8P, 1996 WL 374184, at *5 (1996). Exertional capacity addresses the claimant's abilities to perform various physical activities, such as sitting, standing, walking, carrying, pushing, and pulling. 1996 WL 374184, at *5. An occupation classified at the medium exertional level would require "frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). "If someone can do medium work, we determine that he or she can also do sedentary and light work." *Id.*

In this case, the ALJ concluded that the claimant could perform the full range of work activity at the medium level of exertion. He supported his decision with specific references to the claimant's medical records. In both July 2007, and May 2009, the claimant's own treating physicians advised her that she could return to her work with no restrictions. In 2008, an MRI revealed a significant decrease in the size of the hematoma in her hip. In 2009, X-rays revealed that her hip appeared normal. Dr. Riehl advised the claimant in 2009 that she should simply massage the area, and not seek further treatment at that time. The ALJ expressly stated that he gave the opinions of the claimant's treating physicians considerable weight.

Additionally, the ALJ gave considerable weight to Dr. Chastain's Physical Residual Functional Capacity Assessment, conducted in April 2008. Dr. Chastain found that the claimant could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand about six hours in

an eight-hour workday, and could sit about six hours in an eight-hour workday. He also found

that the claimant had limited ability in her lower extremities to push and pull because of her

inability to push or pull with her right leg. He concluded by stating that the claimant's allegations

were not credible as to her limitations.

Dr. Chastain's assessment supports the opinions of the claimant's treating physicians.

Although the claimant clearly has a right hip injury, neither her treating physicians nor Dr.

Chastain found her unable to perform her job. Medium exertional level work involves lifting and

carrying objects; Dr. Chastain's report supports the ALJ's decision that the claimant could

perform such work. Thus, substantial evidence supports the ALJ's opinion that the claimant

could perform the full range of medium level exertional work.

## B. The claimant's mental impairments

The claimant argued that the ALJ failed to adequately address the claimant's depression

when he decided that she was not disabled. Although this court finds the ALJ committed error by

not classifying the claimant's depression as severe, such error was harmless because the ALJ

addressed the claimant's depression later in his opinion.

An ALJ's inquiry at step two in the disability evaluation process allows "only claims

based on the most trivial impairments to be rejected." *McDaniel*, 800 F.2d at 1031 (11th Cir.

1986). An impairment is severe if it "significantly limits [the claimant's] physical or mental

ability to do basic work activities . . . ." 20 C.F.R. § 404.1520. An impairment is not severe if it

does not significantly limit a claimant's abilities to perform basic work activities. 20 C.F.R. §

404.1521.

In the present case, the ALJ erred in determining that the claimant's mental impairment

was not severe. As the ALJ noted in his opinion, the evidence showed that the claimant had a history of treatment for depression. She reported that she had been taking antidepressants since 1990. In 2008, her psychiatrist noted that she had numerous features of depression and he diagnosed her with major depressive disorder. The claimant's testimony also supported a finding that her depression was not trivial, and instead represented a significant limit on her ability to perform basic work activities. The ALJ's exclusion of the claimant's depression from the list of severe impairments constituted error.

However, the ALJ did not commit reversible error by classifying the claimant's depression as non-severe. The ALJ did find that the claimant's other impairments qualified as severe, and the inquiry into whether the claimant was disabled continued. Moreover, the ALJ provided detailed reasoning and analysis as to why the claimant's depression did not make her disabled. If the ALJ continues with the sequential inquiry, incorrectly classifying an impairment as non-severe is harmless error. *See Delia*, 433 Fed.Appx. at 887. However, the court must address whether the ALJ erred by finding that the claimant's depression resulted in only mild functional limitations with no adverse affect on her ability to perform a full range of work activity at the medium level.

The ALJ expressly articulated his reasons for finding the claimant's statements concerning her mental impairments not credible. He noted that although Dr. Zieba assigned the claimant a GAF of 50 in April 2008, her medications had since been adjusted and her depression had improved. In May 2008, Dr. Wood gave the claimant a GAF of 67, indicating that the claimant only had mild psychological symptoms. The ALJ recorded that Dr. Wood found that the claimant's symptoms affected, but did not preclude, her ability to function in a work

environment. Another physician, Dr. Hennigan, noted in February of 2009 that the claimant's

depression had improved. The ALJ noted that the claimant testified that she could take care of

her household and her own personal needs. She informed Dr. Wood that she could sweep, mop,

vacuum, and wash dishes in limited increments. She further testified that she visited family and

friends once or twice a week. The ALJ found that this testimony did not support the claimant's

allegations that her depression caused significant work limitations.

The claimant argues that the ALJ failed to adequately address the apparent conflict in the

record between Dr. Zieba's report and Dr. Wood's evaluation; to the contrary, this court finds the

ALJ expressly articulated his reasoning for finding the claimant's depression did not prevent

work activity. The ALJ clearly articulated his assessment of the claimant's credibility and

corroborated it by substantial evidence in the record; therefore, the court concludes that

substantial evidence exists to support the ALJ's conclusion that the claimant's testimony of

depression is not credible.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is

supported by substantial evidence and is to be AFFIRMED. The court will enter a separate order

to that effect simultaneously.

DONE and ORDERED this 28th day of March, 2013.

_____

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE